## WILLIAM GOEBEL v. THE STATE.

### No. 2816.　Decided October 14, 1903.

**1.—Evidence—Disconnected Incident.**

Where the incident related by prosecuting witness was an accident and had no connection with the later difficulty, on which the prosecution was based of assault with intent to murder, it having occurred some time prior thereto, it could not illustrate the intent or make manifest any motive or purpose on the part of the defendant in the transaction for which he was being tried, and it was error to admit such testimony.

**2.—Bill of Exceptions—Character Testimony.**

A bill of exception which complained of the court's action in refusing the defendant to introduce character testimony and which does not show, however, that any predicate was laid for its introduction, that is, that defendant had been impeached or was a stranger, was insufficient to review the trial court's action, and this court can not look to the statement of facts to ascertain whether such predicate was laid.

**3.—Evidence—Cross-Examination—Motive.**

A witness for the State was permitted to testify with reference to money which had been missed from the house a few days before the difficulty between defendant and the party alleged to have been injured and the efforts of the peace officers to ascertain who took the money, the opinion of the officers being that some one who lived in said house had gotten the money, defendant having lived in said house, whereupon defendant was not permitted on cross-examination of the witness to show that he had requested the officers to search the premises to show defendant's good faith and want of motive on his part for shooting the injured party. Held, if the testimony of said witness and others was admissible on part of State to show motive, it was competent for defendant to show any circumstance counterveiling said proposition.

Appeal from the District Court of Wichita. Tried below before Hon. A. H. Carrigan.

Appeal from a conviction of assault with intent to murder; penalty, imprisonment for term of two years in the penitentiary.

The material facts are substantially as stated in appellant's brief, to wit:

The shooting of Kierst occurred shortly after sunup in the room occupied by Kierst and appellant as their joint bedroom; they had been roommates and bedfellows for months in this room of a residence owned and occupied by the Kierst family, consisting of Joe Kierst's mother, his two single sisters and himself. Joe Kierst and appellant were each single men, and each about 30 years old. They were not related, but had known each other from boyhood and had always been good friends, at least until a short time before the shooting, and were rooming and sleeping together up to the very moment of the shooting. Appellant, who was born and had lived in New York City all his life, and who was al-

most an invalid, suffering from lung and heart trouble, had come out from New York in the spring of 1901 to Texas for his health, upon the invitation of Joe Kierst, who had urged him to make the Kierst house his home. The greater part of the time from the date of appellant coming to Texas until the time of the shooting, appellant had spent traveling about over the State, but when in Wichita County he regarded the Kierst house his home and stayed there most of the time. In December, 1902, a few days before the shooting, old lady Kierst missed some money from her house and the supposed theft of this money was reported to the officers of the county, who began an investigation. The opinion was expressed by the officers that some occupant of the Kierst home had taken the money, though no complaint was ever filed against anyone. Joe Kierst expressed the belief that one of his sisters or appellant had taken the money. Appellant believed Joe Kierst had taken it, and was investigating and watching Joe for evidences of his guilt, though he had never expressed such a belief to Joe. While matters were in this situation, this shooting occurred. No one saw the difficulty, except Joe Kierst and appellant; they were in a closed room. Each of these two testified on the trial of this case, but the story as to what occurred in that room, as told by each of them, differed so widely and completely that no one who heard the two stories would recognize the transaction as the same. Kierst's story, in substance, was, that while lying asleep on his pillow, appellant, without a word, shot him from behind, the ball entering his head just behind the lower part of his left ear and ranging upward, plowed under the skin and came out over the corner of his left eye. In the scuffle which followed appellant fired two other shots, one of which struck him in the chest, and glancing, entered his right arm. About that time the Kierst women broke into the room and separated the combatants; that he (Kierst) was unarmed and inflicted no injury on appellant, who, at the time the women separated them, showed no evidence of any injury to his person; that a few minutes later he appeared, however, bleeding from several slight gashes on his neck and hands; the theory of Kierst and of the State being that appellant slipped back into the room and inflicted these gashes on himself as a basis for a defense for himself. Such was the story of the prosecuting witness, a story of a deliberate, cowardly attempt to assassinate, without a circumstance to mitigate the enormity of the crime. On the other hand, the other eyewitness (appellant) told a detailed story, fully justifying every shot fired by him. His story was that Kierst was sitting on the side of the bed trimming his corns; that he (appellant) got up on his side of the bed and began dressing. While pulling on his socks he jostled the bed, and Kierst exclaimed, "Stop shaking the bed, you son of a bitch; you'll make me cut myself." To which appellant replied, "I can't help it," or "I don't care if you cut your throat." Thereupon Kierst reached backwards, caught appellant by the hair and slashed at him with his razor, gashing his neck through a stiff, heavy beard he wore, three times; that appellant tried

frantically to ward off the razor and escape Kierst's clutches and finally pulled himself loose, receiving a slash from the razor on his hands as he did so; that he ran to the dresser in the room and secured his pistol, and as Kierst was advancing toward him he fired, missing him the first time and striking him in the chest the second shot. By this time Kierst had seized him around the body, pinioning down appellant's arms from the shoulders to the elbows. In that attitude they scuffled about the room a few seconds, and as Kierst was about to overpower appellant, he turned his pistol's muzzle upwards and fired the third shot, the ball entering behind Kierst's left ear and close enough to burn and blister his ear. This shot stunned Kierst, and to some degree he relaxed his grip. About that time the women broke into the room and separated them. Just after the difficulty Kierst's razor was found partly opened and bloody, lying on the floor on the front side of and near the bed.

It appears that in the latter part of September or the first of October, 1902, three months before the shooting of Kierst, at a time when Kierst and appellant were perfectly friendly, when there was no possible motive, suggested by this record, on appellant's part to hurt Kierst, a gun in appellant's hands was accidentally discharged, narrowly missing Kierst. The circumstances of that shooting seem to us to exclude the possibility of its having been intentional. Kierst himself had no suspicion that it was not accidental. Everybody regarded and treated it as a pure accident, which distressed appellant at the time fully as much if not more than it did anybody.

No further statement is necessary, as the opinion sufficiently states the issues raised.

*R. E. Huff, W. H. Barwise, Jr.,* and *L. H. Mathis,* for appellant.

*Howard Martin,* Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was convicted of an assault with intent to murder, and his punishment assessed at confinement in the penitentiary for a term of two years.

Bill of exceptions number 1 was reserved to the action of the court permitting the State to introduce in evidence the following testimony from the witness Joe Kierst: "In the latter part of September, or the first part of October, 1902, a shotgun in the hands of the defendant (Goebel) was discharged and my face was badly powder burned, though no shots struck me. It occurred in this way: I had left my house early in the afternoon, and had gone to the field to drill wheat. Defendant got on the drill with me and rode with me to the far end of the field from the house. He had my shotgun with him, and stated that he was going over to Mr. Minderman's, a neighbor of ours, to carry him some papers which he had in his hands also. He stated that he was taking the gun along to shoot

45 Crim.—27.

rabbits with.  He did shoot at one of the rabbits as we rode along on the drill.  When we reached the end of the row, at a point nearest to Minderman's, and about one and one-fourth miles from our house, defendant got off the drill and laid the gun down under the fence and went on afoot in the direction of Minderman's.  Late in the afternoon, defendant came back from the direction of Minderman's to where he had left his gun, picked it up and waited until I came near on my drill.  He got on the drill with me, and we started in the direction of my house again, and while riding on the drill we were looking out for rabbits that he might shoot.  When we had gotten almost to the end of the row and within about 300 yards of the house, and while I was standing on the left end of the drill and looking at my team, and while he was standing to my right on the right end of the drill, in some way the gun in his hands was discharged and I felt the sting of the powder grains in the right side of my face.  The horses plunged forward and I had some difficulty in holding them.  When I stopped, I turned towards defendant and he towards me. I exclaimed 'What was that?' or 'How was that?' or something of that sort.  And he exclaimed, 'My God, are you shot?'  I said no, but an instant later as I put my hand up to my face I remarked, 'I believe I am peppered a little.'  I was excited and defendant appeared to be excited and frightened.  When I heard the report of the gun, my first impression was that defendant had shot at a rabbit and the gun had recoiled and the butt of the gun had struck my face, and an instant or so later, when I understood defendant to say something about a lever, I replied, 'Lever, hell!  It was the butt of the gun.'  When I had gotten the horses under control, defendant said for me to go on to the house and he would bring the team on.  I went on to the house and soon defendant came up and suggested that we go for a doctor.  He caught a team and we hooked it up and he and I drove into Iowa Park for a doctor.  He told Dr. Bell to do all he could for me and he would pay his bill; that it was his fault or carelessness that had caused it all.  I don't know whether defendant ever paid the doctor's bill or not.  Dr. Bell told me he had never presented his bill to defendant, and I paid the bill when I paid my other bill this year to Dr. Bell.  All the doctor did was to pick some of the grains of powder out of my face.  I never made any complaint to anyone about this shooting.  I regarded it as an accident pure and simple, and said so to every one to whom I spoke of it.  I wrote to a young lady in New York, with whom defendant was corresponding, assuring her that it was an accident, and told her defendant had accidentally struck the hammer of the gun against one of the levers of the drill and it had been discharged. I thought that was the way it had most probably occurred."  To all this testimony "defendant objected because it was not only irrelevant and immaterial, but was calculated to seriously prejudice the rights of defendant in the case before the jury; that no possible connection was shown between the shooting and the difficulty occurring on December 29, 1903, three

months later; no motive was shown for said first shooting and on the contrary it was clearly shown to have been accidental."

It will be seen from an inspection of the foregoing bill that the incident related by prosecuting witness, Joe Kierst, was an accident, and it had no connection with the later difficulty, on which this prosecution was based of assault with intent to murder, it having occurred some time prior thereto. Being a mere accident, it could not illustrate the intent or make manifest any motive or purpose on the part of appellant in the transaction for which he is now being tried. In our opinion, the court committed an error in permitting this testimony to go before the jury, which requires a reversal of this case. See Barkman v. State, 52 S. W. Rep., 69.

The second bill of exceptions complains that the court erred in refusing to permit appellant to introduce the depositions of various witnesses, by whom he proposed to prove and could have proved that defendant was a peaceable, quiet and inoffensive, law observing, honest, upright and truthful man. When these depositions were offered the district attorney objected on the ground that he had admitted appellant had always borne, from his cradle to the time of the difficulty with Joe Kierst, on December 29, 1902, a good general reputation as to being a quiet, peaceable, inoffensive and law abiding man. When this admission on the part of the district attorney was made, he then objected to the introduction of the depositions because it would be a useless consumption of time. Upon such admission of the district attorney, the court sustained the objection to said questions and answers, and refused to permit appellant to introduce the same. It will be noted that the district attorney's admissions did not go to the full scope of the depositions, inasmuch as he did not admit appellant was honest, upright and truthful. The bill of exceptions does not show, however, that any predicate was laid for the introduction of this character of testimony. The bill does not show that appellant had been impeached or that he was a stranger. We are not permitted to look to the statement of facts to ascertain whether or not this is true. As presented by the bill no error is made manifest.

After Sheriff Howard had testified in behalf of the State, and after Christiana Kierst had testified in behalf of the State concerning the money of Mrs. Kierst that had been missed from the house a few days before the difficulty between defendant and Joe Kierst on December 29, 1902; and after Mrs. Kierst and Christiana Kierst had testified about the efforts the peace officers of the county had been making to ascertain who took the money, and that the sheriff had expressed the opinion that some one who lived under Mrs. Kierst's roof had gotten that money, and while Sheriff Howard was on the witness stand, defendant, through his attorneys, asked said witnesses if defendant had not suggested or requested him as sheriff, during the time he was investigating as to who got the money, to obtain a search warrant and search the Kierst premises for said money. The district attorney objected to said question and an-

swer thereto as immaterial and self-serving, while defendant insisted that the question and the witness' answer thereto was material to show defendant's good faith in making a thorough search for the missing money and would have tended to show to. the jury that no suspicion should attach to him as the taker of the money. The sheriff would have stated that defendant made such suggestion to him. It seems from the bill that this testimony was introduced by the State in the first instance, as above detailed, to show a motive on the part of appellant for shooting the injured party. If the testimony of the sheriff and the other witnesses above detailed was admissible to show motive on the part of appellant to make the assault, clearly it was admissible for defendant to introduce any circumstance or declaration on his part that would show he did not steal the money. If the State by her testimony insists that the circumstances show that defendant stole the money and was trying to assassinate Kierst in order to conceal the crime, then surely the evidence of appellant tending to show that he did not steal it, would be admissible for the purpose of refuting State's evidence on the question of motive. It is a well known rule of criminal law that it is proper for the State to prove a motive; it is equally true that defendant has a right to introduce evidence tending to show a lack of motive on his part, or that contravenes the State's evidence on the question of motive. We think the court erred in not permitting the introduction of this testimony. The declarations of defendant were made before the difficulty, and if he was being tried for theft of the money it would be proper to introduce his declaration and request to the sheriff to search the house, as a circumstance refuting the fact that he stole the money. If theft of the money is being used by the State as a motive for the crime for which he is now on trial, the same character of evidence should have been admitted on behalf of appellant.

We do not think the court erred in failing to charge on aggravated assault, as insisted by appellant. The evidence before us on the part of the State shows assault with intent to murder; on the part of the defense it merely raises the issue of self-defense.

For the errors discussed the judgment is reversed and the cause remanded.

*Reversed and remanded.*